**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

**LIMARY SANCHEZ-ESTRADA,**

**Plaintiff**

**v.**

**MAPFRE PRAICO INSURANCE, CO. et al.,**

**Defendants.**

CIVIL NO. 13-1692 (GAG)

**MEMORANDUM OPINION**

Limary Sánchez-Estrada ("Plaintiff") filed this lawsuit against MAPRE PRAICO Insurance Company ("MAPFRE"), its subsidiary Multiservicar, Inc. ("Multiservicar"), and unnamed companies (collectively "Defendants"), alleging that she was discriminated against on the basis of her gender, pregnancy, and pregnancy related disabilities, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Act, 42 U.S.C. § 2000e(k), Title I of the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and supplemental claims under Puerto Rico law.  (See Docket No. 1.)  Defendants moved to dismiss and the court granted said motion in part, dismissing Plaintiff's claim for gender discrimination not based upon Plaintiff's pregnancy and her Puerto Rico Article 1802 tort claim. (Docket No. 16 at 7.)  As such, Plaintiff's remaining claims allege that Defendants discriminated against her by (1) creating a hostile work environment because of her pregnancy and (2) taking adverse employment actions by giving her a negative employment evaluation, and reprimanding and suspending her for missing work because of her pregnancy and pregnancy related disabilities. (Docket No. 1.)

Civil No. 13-1692 (GAG)

Thereafter, Defendants moved the court for summary judgment. (Docket No. 39.) Plaintiff opposed the motion. (Docket No. 48.) Defendants filed a reply, in which they also moved to strike a self-serving affidavit that Plaintiff heavily relied upon to support her counterstatement of uncontested facts and separate statement of material facts. (See Docket No. 57.) Defendants argued that the affidavit was a sham, as its sole purpose was to create genuine issues of material fact that defeat Defendants' motion for summary judgment, by emphasizing the date that Plaintiff signed the affidavit and pointing to numerous contradictions between Plaintiff's deposition testimony and the affidavit. (See Docket No. 57 at 1-5.) Plaintiff opposed Defendants' motion to strike and also moved this court for sanctions against counsel for Defendants, arguing that he has committed "fraud on the court." (Docket No. 62.)

The court examined the parties' arguments, the affidavit in question, and the pertinent law regarding sham affidavits, and subsequently granted Defendants' motion to strike at Docket No. 57. (See Docket No. 67 at 7.) The court then ordered Plaintiff to resubmit a response to Defendants' motion for summary judgment and statement of uncontested facts that does not include citations to said affidavit. (Id.) Furthermore, the court reminded Plaintiff of the local rules of civil procedure that govern her submission of summary judgment materials, see Local Rule 56, which state that the nonmovant may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts like Plaintiff did in her counterstatement at Docket No. 49. See Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 137 (1st Cir. 2012). It is within the district court's discretion to decide whether to consider additional facts that are not included in the separate section. See id.

Thereafter, Plaintiff resubmitted her memorandum in opposition and the accompanying response to Defendants' statement of material facts. (See Docket No. 69 and 70.) However, in

Civil No. 13-1692 (GAG)

submitting said documents, Plaintiff failed to edit her memorandum to remove arguments supported by the striken sham affidavit.  (See Docket No. 69.)  Further, despite the court's instructions, Plaintiff still included numerous additional facts within her opposition to Defendants' statement of material facts.  (See Docket No. 70.)  More so, in many of her denials to Defendants' statement of facts, Plaintiff either fails to include a citation to the record or includes a citation that does not support the statement of fact, in direct contravention of Local Rule 56(e).  See Local Rule 56(e) ("An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion.  The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment.  The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.").

As such, the court must waste valuable judicial resources to decipher the proper arguments and supporting evidence, but will not sift through Plaintiff's responses to locate additional facts if they are not located in her separate section.  Additionally, the court will disregard the many statements of fact not supported by a specific citation to record and any arguments in the memorandum and statements of fact that reference the striken affidavit.  See Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) (emphasizing the importance of rules within Local Rule 56 and noting that "litigants ignore them at their peril").

Accordingly, after reviewing the parties' submissions and pertinent law, the court hereby GRANTS Defendants' motion for summary judgment at Docket No. 39.

## I.    Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

Civil No. 13-1692 (GAG)

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see Fed. R. Civ. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R.Civ. P. 56(c)(1)(B). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez,

Civil No. 13-1692 (GAG)

440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

## II.    Relevant Factual and Procedural Background

Plaintiff began working for Multiservicar as a receptionist in June, 2011.  (Docket Nos. 39-2 ¶¶ 3-4; 70 at 1-2, ¶¶ 3-4.)  Multiservicar, which is a wholly owned subsidiary of MAPFRE, owns and operates the shop in which Plaintiff began working.  (Docket Nos. 39-2 ¶ 1; 70 at 1, ¶ 1.)  In January, 2012, Plaintiff was promoted to the position of Service Advisor, (Docket Nos. 39-2 ¶ 5; 70 at 2, ¶ 5), and in February or March, 2012, Multiservicar hired a new receptionist.  (Docket Nos. 39-2 ¶ 6; 70 at 2, ¶ 6.)  When she became a Service Advisor, Plaintiff was directly supervised by José Oyola ("Oyola"), and starting in September, 2012, the shop's manager, Luis Crespo ("Crespo") started to indirectly supervise her.  (Docket Nos. 39-2 ¶ 7-8; 70 at 2-3, ¶ 7-8; 73-1 ¶ 8.)  At the request of Crespo, Plaintiff performed repair estimates when appraisers were busy, checked the status of the orders of car parts, called clients on a daily basis, and relayed part orders to the parts department of the shop.  (Docket Nos. 39-2 ¶¶ 38-44; 70 at, 8-9 ¶¶ 38-44.)  Her position also required her, along with other employees, to sometimes stay past the end of her shift to meet with clients who were picking up their cars.  (Docket Nos. 39-2 ¶¶ 47-50; 70 at 10, ¶¶ 47-50.)  During the year of 2011, Oyola did not have any complaints about the work performance of Plaintiff as an employee.  (Docket Nos. 70 at 10, ¶ 2; 70-1 at 29; 73-1 at 21, ¶ 2.)[1]

On September 25, 2012, Plaintiff informed Multiservicar that she was pregnant.  (Docket Nos. 39-2 ¶ 9; 70 at 3, ¶ 9.)  Prior to that date, the Multiservicar had given its employees new

---

[1] As noted above, there are numerous instances in which Plaintiff sets forth a statement of fact and either does not support it by the record or cites to the record, but the evidence does not support her assertion.  For example, for this fact, Plaintiff asserts in her separate statement that she did not have any complaints against her during 2011 regarding her work performance and attendance.  (See Docket No. 70 at 18, ¶ 2.)  A review of the evidence reveals, however, that Oyola testified as to her performance, and never mentioned attendance.  (Docket No. 70-1 at 29.)  For the sake of brevity, the court will not point out each time this occurs, but will discuss the more significant errors.

Civil No. 13-1692 (GAG)

uniforms in August or early September, 2012.  (Docket Nos. 39-2 ¶ 12; 70 at 3, ¶ 12.)  Thereafter, on October 23, 2012, Plaintiff requested new maternity uniforms from Crespo.  (Docket Nos. 39-2 ¶ 13; 70 at 3-4, ¶ 13.)  Crespo responded that he spoke with the human resources director, Wanda Rosario ("Rosario"), and stated that they decided that Plaintiff could stop wearing her uniform and wear her regular clothing to work instead.  (Docket Nos. 39-2 ¶¶ 13, 17; 70 at 3-4, ¶ 13.)  Plaintiff did not receive instructions on what specific clothing to wear.  (Docket Nos. 39-2 ¶ 17; 70 at 4, ¶ 17.)  That same day, Plaintiff emailed Rosario, inquiring about additional uniforms, and Rosario told her that the budget for new uniforms was exhausted.  (Docket Nos. 39-2 ¶ 14; 70 at 4, ¶ 14.)  Indeed, the 2012 budget for uniforms had been used completely by October, 2012, as the company had sustained substantial financial losses that year.  (Docket Nos. 39-2 ¶¶ 15-16.)[2]

MAPFRE has an Attendance and Punctuality Policy that is part of the employee handbook. (Docket Nos. 39-2 ¶ 66; 70 at 12, ¶ 66.)  Plaintiff was notified on July 22, 2011 how to access the handbook and was informed that it was her responsibility to do so.  (Docket Nos. 39-2 ¶ 68; 70 at 12, ¶ 68.)  The Attendance and Punctuality Policy sets forth many rules regarding tardiness and absences from work, including that "[e]very employee that misses work because of a medical appointment must present a certificate of attendance stating the place, date, entrance, and exit times."  (Docket Nos. 39-2 ¶ 71; 70 at 13, ¶ 71.)  Further, the policy states: "[In] cases of maternity, if the employee needs to miss work to receive medical treatment, the employee must present written evidence of her attendance to the medical appointment in order for the absence not to be computed."  (Docket Nos. 39-2 ¶ 71; 70 at 13, ¶ 71.)  Under the policy, "[a]bsences from work due to sickness not covered by authorized leaves such [as] maternity and disabilities under

---

[2] Initially in her complaint, Plaintiff alleged that she was required to wear safety shoes when at work while other employees were not subject to this requirement.  (See Docket No. 1 ¶ 16-19.)  It appears that she has dropped these allegations, as she does not discuss them at this stage.

Civil No. 13-1692 (GAG)

the ADA, will be considered for the accumulation of absences in the following way: (i) single day absences will be considered individually; and (ii) absences of more than two (2) days when a medical certificate s provided will be considered as [a] one day absence." (Docket Nos. 39-2 ¶ 71; 70 at 13, ¶ 71.)  Employees accumulate points, which expire yearly, based upon the following rules: tardiness of no more than fifteen minutes amounts to 0.5 points; tardiness of more than fifteen minutes amounts to 1 point; absences of no more than 3.75 hours amounts to 1 point; absences of more than 3.75 hours but less than 7.50 hours amounts to 1.50 points; full day absences amount to 2 points; and unregistered days after the close of the bi-week amount to 2 points.  (Docket Nos. 39-2 ¶ 71; 70 at 13, ¶ 71.)  Accordingly, the following disciplinary actions are taken when an employee reaches the following point accumulation levels: verbal warning for 10 points; written warning for 15 points; three day suspension for 20 points; and termination from employment for 25 points.  (Docket Nos. 39-2 ¶ 71; 70 at 13, ¶ 71.)

As noted above, on September 25, 2012, Plaintiff informed Multiservicar that she was pregnant.  (Docket Nos. 39-2 ¶ 9; 70 at 3, ¶ 9.)  As of that date, Plaintiff had accumulated 13.50 points under the Attendance and Punctuality Policy and none of the absences up until that point had anything to do with her pregnancy.  (Docket Nos. 39-2 ¶¶ 73-76; 70 at 13-14, ¶¶ 73-76.)[3] When Plaintiff became pregnant, she began to experience some pregnancy related complications, including severe, sporadic back spasms, which caused her to miss work some days starting in October, 2012.  (Docket Nos. 70 at 19, ¶ 7; 73-1 at 22, ¶ 7.)  On October 25, 2012, Plaintiff fainted while at work due to low blood pressure and her co-workers, including Oyola, assisted her and

---

[3] The court highlights that in responding to Defendants' statements of material fact, Plaintiff initially denies the fact that none of her absences prior to September 25, 2012 were related to her pregnancy.  (See Docket No. 70 at 13, ¶ 73.)  Plaintiff points to a medical certificate regarding three absences from September 18-20, 2012, but an examination of said certificate reveals that the same does not indicate that the absences were pregnancy related.  (See Docket No. 70-2 at 35.)  Furthermore, and most notably, three paragraphs down in her counterstatement of facts, Plaintiff readily admits that none of her absences prior to September 25, 2012 were pregnancy related.  (Docket No. 70 at 14, ¶ 76.)

Civil No. 13-1692 (GAG)

called "911" for paramedics.  (Docket Nos. 39-2 ¶ 64-65; 46 at 11; 70 at 12, 64-65; 70 at 20, ¶ 10; 73-1 at 22-23, ¶ 10.)  After being treated at the hospital, Plaintiff's treating physician instructed her to rest until October 27, 2012 and that she could return to work the following day, on October 28, 2012.  (Docket No. 70-3 at 14.)  When Plaintiff returned to work on Monday, October 29, 2012, she gave Oyola a medical certificate that allowed her to return to work.  (Docket Nos. 70 at 20, ¶ 12; 71-3 at 23, ¶ 12.)  During her lunch break, however, Oyola called Plaintiff, telling her that Crespo instructed that she could not return to work until she provided a medical certificate indicating that she could do so.  (Docket Nos. 70 at 20, ¶ 12; 71-3 at 23, ¶ 12.)  Plaintiff responded that she had already handed in such a certificate and was cleared to return to work that day. (Docket Nos. 70 at 20, ¶ 12; 71-3 at 23, ¶ 12.)

Thereafter, in November, 2012, Plaintiff suffered from medical complications that required her to be hospitalized once again.  (Docket Nos. 70 at 21-22, ¶ 16; 71-3 at 24, ¶ 16.)  Plaintiff was hospitalized for back spasms from November 7-12, 2012, and was instructed by her physician to return to remain on bed rest until November 14, 2012.  (Docket No. 70-3 at 3.)  Plaintiff and Oyola spoke on the phone the day that Plaintiff was released from the hospital and she confirmed that she would return to work on November 15, 2012.  (Docket Nos. 39-2 ¶¶ 20-22; 70 at 5, ¶¶ 20-22.) When Plaintiff returned to work on November 15, 2012, she received a written reprimand dated November 8, 2012 for her absenteeism, although the report did not indicate for which period she was being admonished.  (Docket Nos. 49 ¶ 17; 71-3 at 24-25, ¶ 17.)

On November 26, 2012, Plaintiff, along with the rest of Multiservicar employees, received her annual performance evaluation for the 2012 year, in which she was penalized for her attendance record.  (Docket Nos. 39 ¶ 31; 70 at 22, ¶ 18; 73-1 at 25, ¶ 18.)  The evaluation, which was initially drafted by Oyola, gave Plaintiff a total score of 2.87, which means that she met the

Civil No. 13-1692 (GAG)

job requirements.  (Docket Nos. 39-2 ¶ 34; 70 at 8, ¶ 34.)  Specifically, her evaluation concluded that she met the job requirements as to quality, quantity, job knowledge, continuous learning, planning and organization, initiative, adaptability, and dependability.  (Docket Nos. 39-2 ¶ 35; 70 at 8, ¶ 35.)  It also concluded that Plaintiff needed improvement with respect to her attendance and punctuality, cooperation, and teamwork.  (Docket Nos. 39-2 ¶ 35; 70 at 8, ¶ 35.)  Before said evaluation was finalized, Crespo reviewed it with Oyola and Crespo recommended that certain changes be made, some of which negatively impacted the evaluation.  (Docket Nos. 70 at 22, ¶ 19; 73-1 at 25-26, ¶ 19.)  Defendants claim, however, that the final evaluations of other employees supervised by Oyola were also lowered after discussing them with Crespo.  (Docket No. 73-1 at 25-26, ¶ 19.)  Lastly, Plaintiff has not seen the performance evaluations of other employees. (Docket Nos. 39-2 ¶ 37; 70 at 8, ¶ 37.)

Thereafter, on December 4, 2012, Plaintiff received a written memorandum, dated November 28, 2012, informing her that she was suspended without pay until December 10, 2012 because she had accumulated more than 20 points on her attendance record.  (Docket Nos. 70 at 23, ¶ 20; 73-1 at 26, ¶ 20.)  Plaintiff had received two written warnings before she was suspended. (Docket Nos. 39-2 ¶ 81; 70 at 16, ¶ 81.)  The next day, on December 5, 2012, Plaintiff filed a charge of discrimination against Defendants before the Antidiscrimination Unit ("ADU") for pregnancy discrimination.  (Docket Nos. 70 at 23-24, ¶ 22; 73-1 at 27, ¶ 22.)  Up until this point, Plaintiff had received 22.50 points from multiple occasions of tardiness and absenteeism.[4]  (Docket

---

[4] Although Plaintiff disputes some of the specific dates in which she was purportedly absent, and Defendants concede that Plaintiff is correct for two of those dates, the difference in cumulated points amount only to less 1 point: 21.50 cumulative points.  (See Docket Nos. 39-2 at ¶¶ 78-79; 70 at 14-16, ¶¶ 78-79; 70-2 at 36-43.)  Notwithstanding the fact that this has no bearing on Plaintiff's discrimination claims, the court highlights that the difference in disputed points would have not made a difference for her suspension.  As to the remaining dates that Plaintiff claims should not have been counted toward her points, Plaintiff either still uses the stricken sham affidavit as support or cites medical certificates that do not indicate that the visit was pregnancy related.  (See Docket No. 70 at 14-16, ¶ 79.)

Civil No. 13-1692 (GAG)

Nos. 39-2 ¶¶ 78-80; 70 at 14-16, ¶¶ 78-80.)  For some, but not all, Plaintiff submitted medical certificates or other evidence that indicated that her absences were related to her pregnancy, and those absences were not considered for the accumulation of her points.  (Docket Nos. 39-2 ¶¶ 84-85; 70 at 16, ¶ 84-85.)  For example, Plaintiff provided medical certificates evidencing that the following visits were pregnancy related: October 25-26, 2012, December 4, 2012, and January 9, 2013.  (Docket Nos. 39-2 ¶¶ 83-85; 70 at 16, ¶¶ 83-85.)  None of these absences were considered for the accumulation of her points.  (Docket Nos. 39-2 ¶¶ 83-85; 70 at 16, ¶¶ 83-85.)

Further, Plaintiff visited her obstetrician three times, on October 16, November 13, and December 4, 2012.  (Docket Nos. 39-2 ¶ 86; 70 at 16, ¶ 86.)  With the exception of December 4, 2012, however, Plaintiff neither requested nor submitted to Defendants a medical certification indicating that she met with her obstetrician.  (Docket Nos. 39-2 ¶ 87; 46-10 at 29; 70 at 17, ¶ 87.)[5] Moreover, on December 13, 2012, Plaintiff left work early due to her back spasms.  (Docket Nos. 39-2 ¶ 89; 46-22 at 2; 70 at 17, ¶ 89.)  Thereafter, Plaintiff was notified by Rosario that she had not submitted a medical certificate indicating that her absence was pregnancy related and was given until January 4, 2013 to submit said certificate.  (Docket Nos. 39-2 ¶ 89; 46-22 at 2; 70 at 17, ¶ 89.)  Plaintiff did not make an attempt to obtain the medical certificate.  (Docket Nos. 39-2 ¶ 90; 46-10 at 33; 70 at 17, ¶ 90.)[6]

_____

Furthermore, Plaintiff also goes so far as to argue that, although the record reflects that she was absent from work on November 7-9, 2012, said record was forged by someone because she did not sign that particular attendance sheet.  (Docket No. 70 at 15-16, ¶ 79.)  However, the only evidence that Plaintiff uses to support her forgery claim is the sham affidavit that the court has already removed from the record.  Notably, Plaintiff admitted during her deposition that she was absent from work from November 7-14, 2012, which includes the disputed dates.  (See Docket No. 73-4 at 7.)  Accordingly, the court disregards this argument.

[5] Although Plaintiff argues that she visited her obstetrician on October 23, 2012, and accordingly provided a certificate for said visit, the evidence to which she points is merely a certificate indicating that she is under the care of the particular doctor and informs of her due date.  (See Docket No. 70-3 at 4.)  As such, the evidence is not a medical certificate justifying an absence as Plaintiff claims.  Indeed, the obstetrician testified that she only saw Plaintiff on those dates listed above.  (Docket No. 46-13 at 3.)

[6] Once again, Plaintiff makes a counterstatement of fact contrary to that asserted by Defendants and points to evidence in the record that does not support her assertion.  Plaintiff points to the concession of leave form in which

Civil No. 13-1692 (GAG)

On December 10, 2012, when Plaintiff returned to work after her suspension, Rosario reminded her and Oyola that for any pregnancy-related appointments to be excused for purposes of the points system, Plaintiff must submit medical certificates indicating that she visited her gynecologist. (Docket Nos. 70 at 24, ¶ 23; 70-3 at 26; 73-1 at 27, ¶ 23.)   The next week, on December 17, 2012, Jose Barreiro, MAPFRE's Vice President, wrote an email to Oyola and Crespo to inform them that he noticed through the shop's security cameras that Plaintiff "always has her personal phone with her at the table texting too frequently."[7]   (Docket Nos. 70 at 24-25, ¶ 24; 70-3 at 27; 73-1 at 27-28, ¶ 24.)   Plaintiff claims that Crespo later spoke with her about this email, but does not cite to support in the record for this assertion. (See Docket No. 70 at 24-25, ¶ 24.)   Thereafter, on December 27, 2012, Crespo gave Plaintiff a written admonishment for subordination, complaining that she did failed to act with urgency when he requested that she fix an estimate of a rental car quickly and asked her to take some photos of a car. (Docket Nos. 46-10 at 22; 46-12 at 2; 70 at 25, ¶ 25; 73-1 at 28, ¶ 25.)   At that time, Plaintiff was approximately twenty weeks pregnant. (Docket No. 70 at 25, ¶ 25.)

On January 9, 2013, Plaintiff's obstetrician recommended that she seek a license for non-occupational disability through a program known "Seguro por Incapacidad No Ocupacional Temporal," or "SINOT" in its Spanish acronym, because of her pregnancy complications. (Docket

---

Defendants granted her SINOT leave in January for the proposition that she did obtain a medical certificate for her December 13, 2012 absence. (See Docket No. 70-3 at 6.)  Nowhere in that exhibit does it have a medical certificate for her December 13, 2012 absence.  Indeed, Plaintiff admitted in her deposition that she did not obtain said certificate. (See Docket No. 46-10 at 33.)

[7] Defendants object to Plaintiff's citation to the email between Barreiro and Oyola and Crespo, arguing that the content is inadmissible hearsay and said people are not parties to this case. (See Docket No. 73-1 at 27, ¶ 24.) See also Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010) ("[i]n opposing a motion for summary judgment, a plaintiff must proffer admissible evidence that could be accepted by a rational trier of fact as sufficient to establish the necessary proposition") (internal quotation marks omitted).  While the burden is on Plaintiff to rebut this objection, the court notes that a statement made by an agent within the scope of his employment is imputable to the employer as a party admission under Federal Rules of Evidence 801(d)(2)(D). See Fed. R. Evid. R. 801(d)(2)(D); Bacou Dalloz USA, Inc. v. Cont'l Polymers, Inc., 344 F.3d 22, 29 n.4 (1st Cir. 2003).  Therefore, the email is indeed admissible because it is clear that Barreiro made the comments in the email within the scope of his employment as Vice President of MAPFRE.

Civil No. 13-1692 (GAG)

Nos. 70 at 25, ¶ 26; 73-1 at 28-29, ¶ 26.)   Accordingly, due to her back spasms caused by her pregnancy, Plaintiff received disability leave from January 9, 2013 to May 13, 2013.  (Docket No. 46-6 at 4.)   Plaintiff claims that that she began receiving maternity leave benefits on April 15, 2013, and on April 29, 2013, her daughter was born, but does not cite to the record and the record is unclear.  Upon exhausting her pregnancy leave benefits, on June 10, 2013, Plaintiff resigned from Multiservicar.  (Docket Nos. 70 at 25, ¶ 28; 73-1 at 29, ¶ 28.)

Accordingly to Oyola, Plaintiff was always a good employee, whose performance and productivity decreased as a result of her pregnancy.  (Docket Nos. 70 at 28, ¶ 37; 73-1 at 14, ¶ 70.) After Crespo became Oyola's supervisor in September, 2012, Crespo complained to Oyola on multiple occasions that Plaintiff was sick often.  (Docket Nos. 70 at 28, ¶ 39; 73-1 at 32, ¶ 39.) Furthermore, Oyola suffered from a health complication that required him to be absent from work for almost thirty days and he was not reprimanded or suspended from work as a result.  (Docket Nos. 70 at 29, ¶ 42; 73-1 at 32-33, ¶ 42.)   Defendants claim that Oyola was not admonished because he had not reached the required points accumulation.  (Docket No. 73-1 at 32-33, ¶ 42.)

On September 10, 2013, Plaintiff filed suit against Defendants in this court, alleging that Defendants discriminated against her on the basis of her gender, pregnancy, and pregnancy related disabilities.  (See Docket No. 1.)   Defendants then moved to dismiss and the court granted said motion in part, dismissing Plaintiff's claim for gender discrimination not based upon Plaintiff's pregnancy and her Puerto Rico Article 1802 tort claim.  (See Docket No. 16 at 7.)   As such, Plaintiff's remaining claims allege that Defendants discriminated against her by (1) creating a hostile work environment because of her pregnancy and (2) taking adverse employment actions by giving her a negative employment evaluation, and reprimanding and suspending her for missing work because of her pregnancy and pregnancy related disabilities.  (Docket No. 1.)

Civil No. 13-1692 (GAG)

1   **III.    Discussion**

2          As noted above, Plaintiff asserts three claims at this juncture: disparate treatment under

3   Title VII because of her pregnancy; hostile work environment under Title VII because of her

4   pregnancy; and disparate treatment under the ADA because of her pregnancy-related disabilities.

5          In moving for summary judgment, Defendants make the following contentions: (1)

6   Defendants' suspension of Plaintiff was a valid business decision and Plaintiff fails to prove not

7   only that Defendants treated her differently from other employees but also that their actions were

8   mere pretext; (2) Plaintiff's hostile work environment claim does not show severe and pervasive

9   harassment, as her allegations amount to nothing more than isolated work-related incidents; (3)

10  Plaintiff's disabilities did not amount to major life impairments under the ADA; and (4) because

11  Plaintiff fails to prove her federal claims, her Puerto Rico law claims fail as well.  (Docket No. 39-

12  1 at 5-20.)  Plaintiff responds by arguing that: (1) Defendants' admissions as to the quality of

13  Plaintiff's work taken together with the "selective" accumulation of points for her pregnancy-

14  related absences amounts to pregnancy discrimination; (2) despite the employee manual's rules

15  that pregnancy-related medical visits do not count toward the points accumulation, Defendants

16  discriminatorily counted said visits for Plaintiff; (3) the written admonishments, negative

17  evaluation, suspension, and failure to provide Plaintiff with maternity work uniforms all amount to

18  severe and pervasive harassment; and (4) her pregnancy-related disabilities did indeed amount to

19  disabilities under the ADA.  (Docket No. 69 at 5-21.)  The court will address each claim in turn.

20         A.    Pregnancy Discrimination

21         Title VII makes it unlawful "to discriminate against any individual with respect to his

22  compensation, terms, conditions, or privileges of employment, because of such individual's . . .

23  sex." 42 U.S.C. § 2000e–2(a)(1).  The Pregnancy Discrimination Act of 1978 extended Title VII's

24

Civil No. 13-1692 (GAG)

protection against discrimination to specifically include discrimination "on the basis of pregnancy." See 42 U.S.C. § 2000e(k).  As such, it is now well-settled law that that an employer may not discharge or otherwise discriminate against an employee based on the categorical fact of her pregnancy.  See Young v. United Parcel Serv., Inc., 135 S. Ct. 1338, 1344-45, 191 L. Ed. 2d 279 (2015); Martinez-Burgos v. Guayama Corp., 656 F.3d 7, 12 (1st Cir. 2011); Smith v. F.W. Morse & Co., 76 F.3d 413, 424 (1st Cir. 1996).

i.    *Disparate Treatment because of Plaintiff's Pregnancy*

The Supreme Court has held that "[l]iability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision." Young, 135 S. Ct. at 1345 (quoting Raytheon Co. v. Hernandez, 540 U.S. 44, 52, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003)). "[A] plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in McDonnell Douglas." Young, 135 S. Ct. at 1345; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Martinez-Burgos, 656 F.3d at 12.  Although Plaintiff in the present case claims that there is direct evidence of Defendants' discrimination against her because of her pregnancy, the court disagrees, and thus must apply the familiar McDonnell Douglas burden-shifting framework.  See Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000) ("evidence is 'direct' . . . when it consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision"); Smith, 76 F.3d at 413 (noting that only on rare occasions is direct evidence discernible, which would constitute "say, an admission by the employer that it explicitly took actual or anticipated pregnancy into account in reaching an employment decision").

14

Civil No. 13-1692 (GAG)

The initial burden is on Plaintiff to establish a *prima facie* case of pregnancy discrimination. Martinez-Burgos, 656 F.3d at 14. To prove that a particular adverse employment action taken with respect to Plaintiff amounted to discrimination because of her pregnancy, she would have to show that "(1) she was pregnant at the relevant time, (2) her job performance was satisfactory, but (3) her employer took some adverse employment action against her while (4) treating non-pregnant employees differently." Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466, 474-75 (1st Cir. 2002); Martinez-Burgos, 656 F.3d at 12. "Meeting the initial prima facie requirement is 'not especially burdensome.' . . . Satisfaction of the prima facie burden creates a rebuttable presumption that discrimination prompted the challenged adverse employment action." Martinez-Burgos, 656 F.3d at 12. Defendants may then "rebut this presumption by articulating a non-discriminatory reason for the adverse employment action, Smith, 76 F.3d at 421, which eliminates the presumption and shifts the burden back to [Plaintiff] to point to sufficient evidence to demonstrate that [Defendants'] proffered reason is mere pretext and that the true reason is discriminatory." Martinez-Burgos, 656 F.3d at 12; see also Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (noting that rebutting a proffered legitimate reason for the adverse action is more demanding than the *prima facie* stage).

Turning to the present case, the court finds that the first three element of the *prima facie* case are easily met. First, it is undisputed that Plaintiff was pregnant during the relevant period of time in which she claims Defendants discriminated against her. (Docket Nos. 39-2 ¶ 9; 70 at 3, ¶ 9.) Second, Defendants readily admit that her job performance, other than attendance, was satisfactory. (Docket Nos. 39-2 ¶ 34; 70 at 8, ¶ 34.) Third, the adverse employment actions that occurred are: the November 26, 2012 negative evaluation with respect to her attendance and punctuality, cooperation, and teamwork (Docket Nos. 39-2 ¶ 35; 70 at 8, ¶ 35); her suspension

Civil No. 13-1692 (GAG)

without pay on December 4, 2012 (Docket Nos. 70 at 23, ¶ 20; 73-1 at 26, ¶ 20); and not providing her with maternity fit uniforms.  (Docket Nos. 39-2 ¶¶ 13, 17; 70 at 3-4, ¶ 13.)

The fourth element, that Defendants treated non-pregnant employees differently, requires more discussion.  With respect to the November 26, 2012 evaluation, it is undisputed that Plaintiff does not know how other employees were evaluated during that time period.  (Docket Nos. 39-2 ¶ 37; 70 at 8, ¶ 37.)  Further, Oyola testified that after Crespo reviewed the evaluations of other employees, some of their scores also went down.  (Docket No. 70-2 at 10.)  As such, Plaintiff fails to show that Defendants were treating non-pregnant employees differently for this employment action.  With respect to Plaintiff's suspension, Plaintiff claims that Defendants selectively chose to not count some of her absences as pregnancy-related and thus said absences counted toward the accumulation of her points under the Attendance and Punctuality Policy.  However, as indicated in the court's articulation of the facts, it is clear that Plaintiff did not obtain a medical certificate for some of the appointments, despite being reminded of her duty to do so, and for the certificates that she did obtain, many of them do not indicate that the appointment was pregnancy-related.  (Docket Nos. 39-2 ¶¶ 84-85, 89-90; 70 at 16-17, ¶ 84-85, 89-90.)  More so, while Plaintiff claims that Oyola missed almost thirty days of work and was not admonished, Defendants submitted evidence that Oyola's absences did not exceed the twenty point threshold for suspension.  (Docket No. 73-1 at 32-33, ¶ 42.)  Accordingly, it does not appear that Defendants deviated from their Attendance and Punctuality Policy within their handbook, thus treating Plaintiff differently.

Lastly, with respect to Defendants' decision to not supply Plaintiff with maternity fit uniforms once she became pregnant, Plaintiff has shown that she was treated differently than non-pregnant employees because she was forced to wear her regular clothing to work while the rest of the employees wore uniforms.  (Docket Nos. 39-2 ¶ 17; 70 at 4, ¶ 17.)  Although it appears that

Civil No. 13-1692 (GAG)

Plaintiff has only satisfied the *prima facie* case for one of the three claimed adverse employment actions, the court will assume for purposes of this motion that she established her case for all three.

Relying on the assumption that Plaintiff satisfies the *prima facie* case for all three adverse employment actions, the burden of production then shifts to Defendants to provide a legitimate non-discriminatory reason for their actions.  To begin, the court will consider both the November, 2012 evaluation and December, 2012 suspension together because they both rely upon the accumulation of points that Plaintiff claims was discriminatory.  Upon examining the evidence, the court finds that Defendants undoubtedly satisfies their burden of showing legitimate non-discriminatory reasons for the accumulation of Plaintiff's points.  The evidence shows that Plaintiff accumulated more than twenty points under the Attendance and Punctuality Policy due to multiple occasions of being late to work and numerous absences.  (Docket Nos. 39-2 ¶¶ 78-80; 70 at 14-16, ¶¶ 78-80.)  As noted above, for the absences that Plaintiff submitted a medical certificate indicating that the visit was pregnancy-related, no points were accumulated on Plaintiff's account. (Docket Nos. 39-2 ¶¶ 83-85; 70 at 16, ¶¶ 83-85.)  With respect to the remaining absences, although many of them may have been pregnancy related, Plaintiff failed to submit forms indicating as such. (Docket Nos. 39-2 ¶¶ 84-85; 70 at 16, ¶ 84-85.)  Accordingly, those absences were counted as sick time and thus accumulated towards her points.

With respect to Defendants' reason as to why Plaintiff was not provided with maternity fit clothing, Defendants provide undisputed evidence that the 2012 budget for uniforms had been completely exhausted by October, 2012, as the company had sustained substantial financial losses that year.  (Docket Nos. 39-2 ¶¶ 15-16.)  Although the Supreme Court has stated that the legitimate non-discriminatory reason "normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those ('similar in their ability or inability

17

**Civil No. 13-1692 (GAG)**

to work') whom the employer accommodates," Young, 135 S. Ct. at 1354, here, Defendants were simply out of money and they allowed Plaintiff to wear her regular clothing to work.  Thus, the court finds that this was not a situation where Defendants chose to not provide maternity fit clothing because did not want to spend the extra money to accommodate Plaintiff.  Further, Plaintiff has not provided any evidence of situations where other similarly situated employees sought accommodation and Defendants accommodated them in a way that was different than how they treated Plaintiff.

Because Defendants have met their burden, the *prima facie* case vanishes, and Plaintiff's claim now hinges on the final step of the analysis: whether she has presented evidence sufficient to raise a genuine issue of material fact that Defendants' proffered reasons were mere pretext for discrimination.  This step is where Plaintiff's claims ultimately and definitively fail.  With respect to her November evaluation and December suspension, Plaintiff fails to show any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons such that a factfinder could infer that [Defendants] did not act for the asserted non-discriminatory reasons." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (internal quotation marks omitted).  The evidence shows that for many of her appointments, Plaintiff failed to inform her employer that said appointments were pregnancy-related so that those absences would not be counted toward her point balance.  Even if a reasonable jury was to find that all of her post-September 25, 2012 absences were pregnancy-related, the ultimate question is not whether those absences were actually related to her pregnancy, but whether at the time Defendants knew they were prenatal and whether Plaintiff informed Defendants as such through the proper procedures of which she was aware.  See Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005) (noting that the

Civil No. 13-1692 (GAG)

question is not whether the proffered reason is false, but whether the employer actually believed it to be real). Indeed, Plaintiff was reminded by Defendants that she must provide proof that her absences were pregnancy-related and nonetheless did not. (Docket Nos. 39-2 ¶ 89; 46-22 at 2; 70 at 17, ¶ 89.)

"The 'ultimate touchstone' of the McDonnell Douglas analysis is whether the employer's actions were improperly motivated by discrimination." Kosereis, 331 F.3d at 213-14; see also Ronda-Perez, 404 F.3d at 45 ("[a] 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks"). In this case, Plaintiff has simply failed to show that Defendants' evaluation of her and the subsequent suspension were motivated by her pregnancy. Although it is undisputed that after Crespo became Oyola's supervisor in September, 2012, Crespo complained to Oyola on multiple occasions that Plaintiff was sick often, (Docket Nos. 70 at 28, ¶ 39; 73-1 at 32, ¶ 39), this is not sufficient to show that Defendants selectively counted some of her absences as sick leave in an improper manner because of Plaintiff's pregnancy. The evidence shows that she simply failed to follow the requirements set forth in the employee handbook. Notably, for the days that Plaintiff informed Defendants that her absences were pregnancy-related, no points were added to her account. (Docket Nos. 39-2 ¶¶ 83-85; 70 at 16, ¶¶ 83-85.) Lastly, with respect to Defendants' decision to not provide Plaintiff with maternity fit work uniforms, Plaintiff fails to provide any reasons why this decision was pretext for pregnancy discrimination.

Accordingly, for the aforementioned reasons, the court hereby **GRANTS** Defendants' motion for summary judgment as to Plaintiff's pregnancy disparate treatment claim and thus **DISMISSES** said claim.

Civil No. 13-1692 (GAG)

ii.   *Hostile Work Environment because of Plaintiff's Pregnancy*

The Supreme Court has held that discrimination "because of . . . sex" also includes "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). To succeed on a hostile work environment claim against Defendants, Plaintiff must establish six elements: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, meaning that a reasonable person would find it hostile or abusive and that she in fact did perceive it to be so; and (6) that some basis for employer liability has been demonstrated. Perez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 27 (1st Cir. 2011).

The First Circuit has recognized that evidence of "sexually-charged or salacious behavior" is not necessary to prove the existence of a hostile work environment, as "incidents of nonsexual conduct—such as work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment." O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001); Gorski, 290 F.3d at 474-75. Further, the thrust of the court's inquiry at summary judgment is typically the determination of whether a reasonable person would find the particular conduct hostile or abusive, which requires it to consider "the totality of the circumstances, including factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . .  to distinguish between the ordinary, if

20

Civil No. 13-1692 (GAG)

1   occasionally unpleasant, vicissitudes of the workplace and actual harassment."  Noviello v. City of

2   Boston, 398 F.3d 76, 92 (1st Cir. 2005) (referencing Harris, 510 U.S. at 23).

3         Turning to the present case, taking all of the evidence together in the light most favorable

4   to Plaintiff, the court holds the evidence would not permit a jury, as a matter of law, to find that a

5   hostile work environment existed.  As noted exhaustively above, the evidence shows that Plaintiff

6   simply failed to comply with the requirements under the Attendance and Punctuality Policy when

7   she missed work on multiple occasions.  While the court does not doubt that these absences were

8   likely pregnancy-related, the law does not fault Defendants for punishing Plaintiff when she failed

9   to comply with the attendance requirements.  Moreover, for each of the other incidents that

10  Plaintiff alleges were discriminatory, including the phone calls by Oyola in which he checked on

11  Plaintiff's medical certificates, Barreiro's email regarding her cellphone use, and Oyola's

12  admonishment of her for failing to act with urgency, Defendants have provided legitimate non-

13  discriminatory reasons for their actions.  Most notably, even if they did not provide legitimate

14  reasons, there is no evidence that allows for any inference that those actions were motivated by

15  discriminatory animus toward Plaintiff's pregnancy.  Further, while the alleged severity and

16  pervasiveness of the alleged harassment is undoubtedly a question for the jury, the First Circuit has

17  consistently acknowledged that summary judgment remains "an appropriate vehicle for policing

18  the baseline for hostile environment claims."  Billings v. Town of Grafton, 515 F.3d 39, 50 (1st

19  Cir. 2008); Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006); Noviello, 398

20  F.3d at 94 (noting that the court's "function is one of screening, that is, to determine whether, on

21  particular facts, a reasonable jury could reach such a conclusion").

22        Accordingly, the court finds that Defendants did not create a "workplace [that was]

23  permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficient severe or

24

Civil No. 13-1692 (GAG)

pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment." Harris, 510 U.S. at 21.  Therefore, the court **GRANTS** Defendants' motion for summary judgment with respect to Plaintiff's hostile work environment claim and thus **DISMISSES** said claim.

### iii.    Safety Shoes Allegations

Before moving onto Plaintiff's claim under the ADA, the court briefly notes in her complaint, Plaintiff initial alleged that Defendants discriminated against her because they required her to wear "esthetically" unattractive and uncomfortable safety shoes when at work while other similarly situated employees were not subject to this requirement.  (See Docket No. 1 ¶ 16-19.) However, at this stage, it appears that Plaintiff has dropped these allegations, as she does not discuss them in her memorandum or her statement of uncontested facts.

Accordingly, insofar as Plaintiff may have alleged discrimination in under this theory, the court **DISMISSES** said claim.

### B.    Disability Discrimination Under the ADA

Turning to Plaintiff's ADA claim, to state a claim of disability discrimination under Title I of the ADA, Plaintiff must allege facts showing that: (1) she was disabled within the meaning of the Act; (2) she could perform the essential functions of her job, with or without reasonable accommodation; and (3) the employer took adverse action against her, in whole or in part, because of her disability.  Roman-Oliveras v. Puerto Rico Elec. Power Auth., 655 F.3d 43, 48 (1st Cir. 2011); Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 82 (1st Cir. 2008).  An individual is considered disabled for purposes of the ADA if she "(1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3)

Civil No. 13-1692 (GAG)

is regarded as having such an impairment." <u>Roman-Oliveras</u>, 655 F.3d at 48 (citing 42 U.S.C. § 12102(2)); <u>Ruiz Rivera</u>, 521 F.3d at 82.

The resolution of this claim is simple.  Although the parties spend a great deal of effort arguing over whether Plaintiff's pregnancy-related complications qualify as disabilities for under the ADA, the court finds that Plaintiff fails to state a *prima facie* case for the reasons stated above in part III.A.i of this opinion.  Plaintiff has the burden of proving that Defendants took adverse action against her, in whole or in part, because of her disability.  As articulated above, the evidence shows that Defendants' actions in failing to provide her with maternity uniforms, evaluating, reprimanding, and suspending her were all for legitimate non-discriminatory reasons absent of any discriminatory animus.  As such, just like with her Title VII claim, Plaintiff's ADA claim fails as a matter of law before it gets to a jury.

Accordingly, for these reasons the court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's claim under the ADA and thus **DISMISSES** said claim.

C.    <u>State Law Claims</u>

Lastly, because all of Plaintiff's federal claims have been dismissed, the court hereby dismisses Plaintiff's Puerto Rico claims as well.  Law 44 "is Puerto Rico's counterpart to the ADA." <u>Salgado-Candelario v. Ericsson Caribbean, Inc.</u>, 614 F. Supp. 2d 151, 175 (D.P.R. 2008); <u>Vazquez v. Municipality of Juncos</u>, 756 F. Supp. 2d 154, 166 (D.P.R. 2010).  It prohibits discrimination against "persons with any kind of physical, mental or sensory disability" by any public or private institution in Puerto Rico, P.R. LAWS ANN., tit. 1, § 504, and "was intended to harmonize Puerto Rico law with the federal statutory provisions of the ADA." <u>Torres-Alman v. Verizon Wireless Puerto Rico, Inc.</u>, 522 F. Supp. 2d 367, 401 (D.P.R. 2007).  The elements of proof for a claim under Law 44 are essentially the same as those for establishing a claim under the

Civil No. 13-1692 (GAG)

ADA.  Salgado-Candelario, 614 F. Supp. 2d at 175.  Moreover, the doubling of damages that is part of the remedy set forth in Law 100 was adopted as a remedy available for claims related to violations of Law 44.  See P.R. LAWS ANN. tit 1 § 511; Rivera Flores v. Cia ABC, 138 P.R. Dec. 1, P.R. Offic. Trans. (1995).  Furthermore, courts have consistently analyzed discrimination claims under Law 3 like a Title VII discrimination cause of action.  See Pagan-Alejandro v. PR ACDelco Serv. Ctr., Inc., 468 F. Supp. 2d 316, 328 (D.P.R. 2006) (finding where genuine issue of facts exists as to plaintiff's Title VII claim for pregnancy discrimination, a genuine issue of material fact exists as to the alleged violations of Puerto Rico Law Nos. 3 and 69); Mejias Miranda v. BBII Acquisition Corp., 120 F. Supp. 2d 157, 174 (D.P.R. 2000) ("Laws No. 3 and 69 causes of action are almost identical to EEOC's guidelines for Title VII discrimination causes of action, that is gender/pregnancy discrimination causes of action.").  As such, finding that no genuine issues of fact exists under the federal scheme necessarily requires the court to find the same with respect to Plaintiff's Puerto Rico claims.

Therefore Plaintiff's Puerto Rico law claims brought under Law 44 of July 2, 1985, P.R. LAWS ANN. tit. 1, § 501, *et seq*.; Law 100 of June 30, 1959, as amended P.R. LAWS ANN. tit. 29, § 146 *et seq.*; and Law 3 of March 13, 1942, P.R. LAWS ANN. tit. 29, § 469 *et seq*. are hereby **DISMISSED.**

**IV.    Conclusion**

Accordingly, the reasons articulated in this opinion, the court hereby **GRANTS** Defendants' motion for summary judgment at Docket No. 39 and thus **DISMISSES** Plaintiff's case in its entirety.  Judgment shall be entered accordingly.

**Civil No. 13-1692 (GAG)**

**SO ORDERED.**

In San Juan, Puerto Rico this 2nd day of September, 2015.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge
